# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00C6010    99C290 | DATE | Dec. 4, 2002 |
| CASE TITLE | Harriet G. Woodward    v    Alan Myres, etc.,et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]
## Memorandum opinion and order entered.
## Accordingly, defendants' motions for summary judgment are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | DEC - 5 2002 | |
| X | Notices mailed by judge's staff. | | date docketed | **41** |
| | Notified counsel by telephone. | | WB | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | CLERK, U.S. DISTRICT COURT    02 DEC -4 PM 3: 44    Date/time received in central Clerk's Office    10 | date mailed notice    mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARRIETT G. WOODWARD, Special )
Administrator of the Estate of Justin Farver, )
deceased, )
)
            )    No.     00 C 6010
         Plaintiff, )            99 C 0290
)
    v. )
)    Judge Robert W. Gettleman
ALAN MYRES, OFFICE OF THE LAKE )
COUNTY SHERIFF, CORRECTIONAL )
MEDICAL SERVICES OF ILLINOIS, INC., )
KAREN DEAN, R.N., JOEL MOLLNER, )
L.C.S.W. and MICHAEL FERNANDO, M.D., )
individually and as agents of Correctional )
Medical Services, Inc., )
)
        Defendants. )

## <u>MEMORANDUM OPINION AND ORDER</u>

This action stems from the October 13, 1998, suicide of Justin Farver ("Farver"), a pre-

trial detainee at the Lake County Jail ("the jail"). Farver's estate first filed Case No. 99 C 0290

against defendants Karen Dean, R.N. ("Nurse Dean"), Correctional Technician Alan Myres

("Officer Myres"), and Correctional Medical Services of Illinois, Inc. ("CMS"). On September

29, 2000, Farver's estate filed Case No. 00 C 6010 against Nurse Dean, CMS, Office of the Lake

County Sheriff, Joel Mollner, L.C.S.W. ("Mollner") and Michael Fernando, M.D. ("Dr.

Fernando").

In a memorandum opinion and order dated May 11, 2001, <u>Woodward v. Myres</u>, No.

99C0290, 2001 WL 506863 (N.D.Ill. May 14, 2001) ("<u>Woodward I</u>"), the court denied motions

for summary judgment in Case No. 99 C 0290 with respect to counts IV and VI, which alleged

that CMS and Nurse Dean deprived Farver of his Due Process rights guaranteed by the

41

Fourteenth Amendment to the United States Constitution. Shortly thereafter, on May 30, 2001, this court consolidated Case Nos. 99 C 0290 and 00 C 6010. Discovery concluded on December 1, 2001.

Plaintiff's first amended complaint in Case. No. 00 C 6010 asserts seven counts against defendants. Counts I, II, III, V, and VII seek damages against the Office of the Sheriff of Lake County, CMS, Nurse Dean, Mollner, and Dr. Fernando, respectively, pursuant to 42 U.S.C. § 1983, for allegedly violating Farver's Fourteenth Amendment Due Process rights. Counts IV and VI assert negligence claims under the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1, against Mollner, CMS, and Dr. Fernando. After the close of discovery, Nurse Dean, Mollner, Dr. Fernando and CMS moved for summary judgment with respect to plaintiff's § 1983 claims against them; in addition, Mollner and Dr. Fernando moved for summary judgment with respect to plaintiff's Illinois Wrongful Death Act claims. For the reasons stated herein, defendants' motions are denied in their entirety.[1]

## FACTS

In its previous summary judgment ruling with respect to Nurse Dean's and CMS' § 1983 claims, the court exhaustively chronicled many of the facts underlying the instant dispute. Rather than reiterating those facts, the court refers the parties to Woodward I. Additional facts that have come to light since Woodward I, however, are summarized below, insofar as they are material to the instant motions.

_____

[1]Because of the additional evidence adduced in support of the instant motions for summary judgment, the court construes Nurse Dean's and CMS' motions as renewed motions for summary judgment rather than motions to reconsider.

To begin, plaintiff and Nurse Dean dispute whether circling "yes" in response to Question No. 8 on the Intake Mental Health Screening Form ("intake form"), and then not informing the shift commander, was appropriate conduct. In her Rule 56.1 Statement of Uncontested Material Facts, Nurse Dean states the following:

> Nurse Dean marked "yes" next to Question No. 8 on the [intake form] asking if the inmate "expresses thoughts of killing self" because Justin had harbored thoughts, in the past, that he wanted to kill himself. Nurse Dean interpreted prior suicidal thoughts as falling within the definition of "expresses thoughts of killing self" on the [intake form]. All of CMS' nurses who utilized CMS' [intake form] interpret Question No. 8 in the same manner as Nurse Dean. (Citations omitted).

To this end, in her deposition, Therese Fryksdale, R.N., formerly a supervising nurse for CMS, testified that "[Question No. 8] is a past, present, future kind of question that is further defined by some of the questions on the [intake form]," and that, "on occasion" a nurse will circle "yes" in response to Question No. 8, yet not inform the shift commander.

In response, plaintiff points to the following deposition testimony of Mary Petkus, R.N.:

> Q.    Number eight: Expresses thoughts about killing self. That was one of the answers that was shaded; is that correct?
> A.    Yes, sir.
> Q:    It would be required then that the shift commander be notified?
> A:    Absolutely.

In addition, plaintiff's expert, Robert Greifinger, M.D.,[2] stated that Nurse Dean's failures to "alert the shift commander as per the instructions on the [intake] form" and to "call for an immediate mental health evaluation" of Farver constituted breaches of the standard of care.[3]

---

[2]Dr. Greifinger, a licensed pediatrician, served as the chief medical officer for the New York State Department of Correctional Services from 1989 through 1995.

[3]Dr. Greifinger also cited Nurse Dean's failure to, (1) complete the "Summary" and "Disposition" sections of the form, (2) retrieve Farver's prior medical records, and (3) notify her supervisor of Farver's suicide risk, as breaches of the standard of care.

According to Dr. Greifinger, "[Nurse Dean did not have] the training or experience in suicide risk assessment to override a carefully constructed document that has been developed over decades of research on risk factors for suicide." Syed Ali, M.D., another expert retained by plaintiff, similarly testified that, in failing to alert the shift commander, Nurse Dean deviated from the standard of care applicable to her.

The parties further dispute the functions of the "Summary" and "Disposition" sections on the intake form. The "Summary" portion of the form allows the writer to choose from the following options in rating the detainee: "(1) No mental health problems; (2) Mental health problems requiring routine follow-up; (3) Chronic mental health problem—(a) Mental Illness; (b) Developmental Disability; or (c) Other; (4) Acute mental health problem—(a) Psychosis; (b) Suicidal; or (c) Other; (5) Potential withdrawal from substance abuse." The "Disposition" portion of the intake form gives the writer the following options: (1) Approved for General Population: No Mental Health Referral; (2) Approved for General Population: Routine Mental Health Referral; (3) Special Housing: Mental Health Referral ASAP; (4) Suicide Precaution Procedures: Mental Health Referral ASAP; (5) Psychiatric Referral; (6) Medical Monitoring for Potential Withdrawal."[4]

According to Nurse Dean's deposition testimony, because she knew that Farver was already going to be placed in the medical pod, where inmates receive routine mental health evaluations within two weeks of placement, she did not complete the "Disposition" and

_____

[4]Numbering supplied for clarity; the actual form has blank lines for the writer to mark with an "X" or check.

4

"Summary" sections of the intake form. Nurse Fryksdale testified that these omissions did not constitute a breach of the standard of care.

As plaintiff points out, however, the plain text of the "Disposition" and "Summary" sections of the intake form refers to the necessary restrictions and conditions of a detainee's housing, such as suicide precaution measures, medical monitoring, and mental health referrals, in addition to housing assignments. Moreover, plaintiff's expert, Dr. Greifinger, testified in his deposition that Nurse Dean's failure to fill out the "Disposition" and "Summary" sections constituted a breach of the standard of care.[5]

The parties do not dispute that the space for a supervisor's reviewing signature is conspicuously blank on Farver's intake form. According to Nurse Fryksdale's deposition testimony, the supervising nurse had occasion to review and sign the intake form only for "inmates who were deemed by [her] staff to have any exceptional needs," such as when an inmate or detainee was suicidal and needed an immediate referral to a psychiatrist or social worker. Aside from characterizing Nurse Fryksdale's statements as "self-serving," plaintiff does not assert a factual basis for disputing her testimony on this issue.

In support of the instant motion, defendant attached excerpts from CMS' Policy and Procedures Manual. In pertinent part, No. 31.01 provides as follows:

> Inmate with no current problems, but a history of psychiatric problems, will be
> referred to mental health staff by completion of a Referral to Mental Health

---

[5]Rachel Schreiner, L.P.N., further testified that, with respect to CMS' initial training on how to conduct intakes, Nurse Dean did "not want to complete her orientation... as though she didn't want to be told what to do." When asked whether she reported Nurse Dean's behavior to her supervisors, she responded, "I don't know if I did. I think at that point it wouldn't have done any good anyway.... Because [Nurse Fryksdale] wasn't really good at responding to things like that."

form... (a) If referral suggests imminent risk, the inmate will be placed under constant observation until evaluation by mental health staff can be completed; (b) If referral indicates need for routine follow-up, inmate will be evaluated by mental health staff within three working days.

The parties agree that all patients in the medical pod undergo a mental health evaluation within fourteen days of arriving at the jail. Moreover, the parties do not dispute that CMS' Lake County operation has been accredited by the National Commission on Correctional Health Care (NCCHC) for the past twelve years, and that CMS' policies and procedures manual is modeled after the NCCHC standards.

On October 1, 1998, Farver received a mental health evaluation from Mollner. On Farver's Mental Health Intake Evaluation form, Mollner noted that Farver was not currently receiving psychotropic medication and that, although he was considered by Mollner to be "coherent, oriented, and rational," Farver felt, "anxious, depressed, and not himself." In response to the question, "History of suicidal ideation or behavior?" Mollner circled "Yes," and added the following:

> Over 10 self-destructive episodes. Most recent, 1995. Feels current suicidal proclivities as he knows what he did was wrong [and he is] not looking to spend rest of his life in prison. Over 10 psychiatric hospitalizations, most recent 4/95, for suicide attempt. Single, no children. Employed in child care [and] has cerebral palsy. Felt anxious.

In response to "treatment plan," Mollner wrote: "depressed, angry." Several days later, Mollner referred Farver to the jail psychiatrist, Dr. Fernando. Mollner did not request that

Farver be placed on suicide watch, however, erroneously believing that Farver's placement in the medical pod meant that he must have already been on suicide watch.[6]

Plaintiff has provided the sworn statement of Willie Marie Clark, R.N. ("Nurse Clark"), originally identified as a defense witness in the instant case, as evidence that Mollner was resistant to placing inmates on suicide watch.[7] According to Nurse Clark:

> Q: So were there occasions where an inmate told you he had feelings of suicide and you checked it on the form and you gave the form to Mr. Mollner or put it on his desk and he reprimanded you for doing that?
> A: Yes.
> Q: Was that a frequent problem?
> A: Very frequent.... He would come in ranting and raving, waiving [sic] the paper up in his hand and he's almost to the point of yelling and slapping the paper on his hand and, you know, telling me why are you giving me this? I don't need this. This person is not going to commit suicide. And he would throw the paper down.... He would tell me every time you give me one of these I have to follow up on it and it's ridiculous.
>
> ...

---

[6]In October 1998, inmates who were placed on suicide watch were housed either in the medical pod or in a cell in the booking area. Mollner acknowledges that not all patients on the medical floor are on suicide watch. Nonetheless, he testified in his deposition that he "wasn't aware of any other reason" that Farver would have been there, as Farver's cerebral palsy "was so mild that that didn't cross [his] mind that that's why [Farver] was up there [in the medical pod]."

[7]Defendants have moved to strike Nurse Clark's sworn statement because "the plaintiff did not obtain or produce the statement during discovery and did not even disclose the existence of the statement until after the defendants filed their motions for summary judgment." The court agrees with defendants that Nurse Clark's sworn statement is not properly characterized as privileged work product, and that the contents thereof are indeed discoverable.

Having said that, however, the court notes that although defendants may have been surprised by the contents of Nurse Clark's sworn statement, they certainly could not have been surprised that she had information that is material to the instant dispute. Indeed, in their October 12, 2001, Supplemental Answers to Plaintiff's Interrogatories, defendants disclosed Nurse Clark as a potential witness. Thus, rather than striking the statement, the court concludes that the appropriate remedy is to reopen discovery for the limited purpose of allowing defendants to depose Nurse Clark.

> Q: Did you ever bring Mollner's attitude in this regard to the attention of Ms. Friegsdale [sic] or Mr. Morris or Mr. Khurana?
>
> A: ... I took it to Friegsdale [sic].... I told her I said what's he's saying is directly the opposite of the policy. I told her I said I know what I'm doing is the right thing. She said sure you are. She said he's just like that. Don't worry about it. Just ignore it.
>
> Q: Well, did the practice though that Mr. Mollner had of refusing to follow up on suicidal patients continue even after that conversation?
>
> A: Yes, it did. And also I have - I had nurses come to me, you know, on my shift and they would say do you think I should put this person on suicide watch because you know we are going to hear it with Joe....

Nurse Clark further described the atmosphere at the jail as "chaotic," testifying that "[s]tuff wasn't where it was supposed to be, files weren't filed." She also noted that, on more than one occasion, she observed nurses who administered drugs to patients while being under the influence of drugs and/or alcohol. Moreover, when asked whether CMS' policies and procedures, as described in its manual, were "as a practical reality followed at the jail clinic," she responded, "No. Very little."

Nurse Clark's observations were echoed by Rachel Schreiner, L.P.N. ("Nurse Schreiner"), who stated in her deposition that she observed other nurses coming to work drunk. With respect to CMS' adherence to its stated policies, Nurse Schreiner testified:

> Q: [W]as it your impression that what was really going – the actual reality of what was going on at the jail was not consistent or didn't meet what was written in the manual?
>
> A: Yes.
>
> Q: How so?
>
> A: There were just so many things....

8

Nurse Schreiner also testified that the jail was, at times, a month behind in conducting intakes and that this had an impact on the quality of care being given to the inmates. According to Nurse Schreiner, "[P]eople could fall through the cracks."

Dr. Fernando evaluated Farver on October 11, 1998. His Psychiatric Evaluation form noted that Farver requested to see him "[because] of recent suicidal thinking" and described Farver as feeling "hopeless, helpless, worthless." Dr. Fernando prescribed Zoloft, an anti-depressant, and Ativan, a tranquilizer, both of which were administered to Farver on October 12, 1998 and October 13, 1998.[8] The parties do not dispute that Ativan begins working almost immediately, whereas the Zoloft takes weeks to improve depressive symptoms in "the vast majority of patients."

Dr. Fernando understood, incorrectly, that Farver was on suicide watch. According to his deposition testimony, "Practically all the inmates that are in medical are on some sort of observational status. Particularly given what I knew about him from what this person authored on the assignment sheet, that suggested to me that he was on a suicide watch." The assignment sheet indicated that Farver had some "current suicidal ideations," as well as ten prior psychiatric hospitalizations.

## DISCUSSION

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to

---

[8]Plaintiff disputes that the medications were properly administered, based on Nurse Clark's sworn statement that she had, on more than one occasion, observed nurses who were under the influence while administering medication to inmates. By itself, however, this testimony, relating to conduct that did not occur on October 12 or 13, 1998, does not undermine defendant's contention that the Ativan and Zoloft were properly administered to Farver.

judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. As always, the court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992). With these standards in mind, the court examines each defendant's motion to dismiss below.

**Count III[9] – Plaintiff's §1983 claim against Nurse Dean**

The crux of Nurse Dean's motion for summary judgment is that the uncontroverted evidence establishes that she interpreted "expresses thoughts of killing self" on Question No. 8 of the intake form as encompassing prior rather than current suicidal thoughts. Accordingly, Nurse Dean maintains she was not subjectively aware of a substantial risk of serious injury to Farver, and that her failure to notify the Shift Commander of Farver's affirmative response to Question No. 8 did not amount to deliberate indifference. Plaintiff responds that the question of whether

_____

[9]In Case No. 99 C 0290, plaintiff's § 1983 claim against Nurse Dean was designated as Count VI.

10

Nurse Dean was deliberately indifferent is a question of fact for the jury to decide. Plaintiff maintains that sufficient evidence has been presented to lead a jury reasonably to conclude that Nurse Dean knew about and deliberately disregarded Farver's need for mental health care.

"Deliberate indifference" involves more than mere negligence, but less than the purposeful or knowing infliction of harm. Farmer v. Brennan, 511 U.S. 825, 836 (1994). In the context of suicide cases, the deliberate indifference standard of liability requires that "a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act." Estate of Novack v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000).

The deliberate indifference standard is subjective: "[The] official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference." Farmer, 511 U.S. 825 at 837. Plaintiff need not present direct evidence of Nurse Dean's knowledge that a substantial risk of suicide existed, however. A jury could make that inference based solely on a finding that the risk was obvious. See id. at 842 ("Whether a prison official had the requisite knowledge . . . is a question of fact subject to demonstration in the usual ways . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Thus, at this stage of the litigation, plaintiff need produce only enough evidence upon which a reasonable jury could base a finding that the risk that Farver would commit suicide was obvious, and yet Nurse Dean did nothing to prevent that harm.

The court finds that plaintiff has met this requirement. To begin, there is a genuine issue of material fact as to whether Nurse Dean knew that Farver's mental state posed a substantial risk

11

to his safety. Nurse Dean maintains that when she asked Farver whether he had any current thoughts of taking his life, he responded negatively. Nonetheless, in her response to Question No. 8 on the intake form, "Expresses thoughts about killing self?" she circled "Yes." In an effort to explain this seeming inconsistency, Nurse Dean maintains that "thoughts" includes present thoughts, as well as past thoughts, and she has produced evidence that other CMS nurses interpret the form in the same manner.

Nurse Dean contends that when she circled "Yes" in response to Question No. 8, she was referencing only Farver's past thoughts of killing himself (for example, his 1995 suicide attempt). Thus, when she considered the affirmative response to Question No. 8 in the context of Farver's other responses to her questions, as well as the judge's order to direct Farver to the medical pod, Nurse Dean did not feel compelled to notify the shift commander that Farver needed an immediate mental health evaluation, and she did not place Farver on suicide watch.

Notwithstanding Nurse Dean's after-the-fact explanation, a reasonable jury could find that Nurse Dean was subjectively aware of Farver's suicidal proclivities based on her affirmative response to Question No. 8. The mental health screening form posed a simple question in present tense, and Nurse Dean made no effort on the form to modify the response she gave to that question to indicate that it referred to past events, notwithstanding her modifications to other questions on the intake form.[10]

---

[10]Additionally, there is some indication from her testimony that Nurse Dean might have recklessly discounted Farver's suicidal proclivity based on the fact that "there was [sic] no trains" in the jail, making his thoughts of suicide "irrelevant" in her estimation. See Woodward I, 2001 WL 506863, at *1.

Nurse Dean's understanding that Farver would receive a mental health examination as a result of his placement in the medical pod does not alter the court's conclusion. A patient who is placed in the medical pod without a mental health referral may not receive a mental health evaluation until fourteen days after placement. In the instant case, Farver received his mental health evaluation seven days after being placed in the medical pod. Had Nurse Dean notified the shift commander of her affirmative response to Question No. 8, however, Farver would have received a mental health examination within 72 hours, which may have led to a more prompt evaluation by Dr. Fernando and more timely and effective administration of anti-depressants. Accordingly, Nurse Dean's belief that Farver would ultimately receive a mental health evaluation in the medical pod does not excuse her failure to notify the shift commander of Farver's suicidal thoughts.

As noted in Woodward I, even if Nurse Dean was not subjectively aware of the risk that Farver would take his own life, a reasonable trier of fact could certainly find that such a risk was obvious. Nurse Dean knew that: (1) Farver had attempted suicide in the past; (2) Farver's mother had attempted or committed suicide; (3) Farver suffered from cerebral palsy; (4) Farver had a history of psychotropic medications and psychiatric hospitalization; and (5) Farver was "always worried."

Nurse Dean's attempt to characterize her decision in the instant case as a treatment decision, that is more properly framed as the basis for a medical malpractice case, is unpersuasive. According to Nurse Dean, "At best, the basis of the plaintiff's claim is that there is a conflict between medical professionals over the possible interpretations of the [intake form]." As the court noted in Woodward I, however, deliberate indifference may be inferred from

13

treatment decisions that constitute "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Woodward I, 2001 WL 506863, at *5, quoting Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-262 (7th Cir. 1996).

The directive at the bottom of the intake form does not instruct the prison official to notify the shift commander only in the event that there is an affirmative response to Question No. 8 with respect to present suicidal thoughts; the form unambiguously says, "If there are any [yes] circles in shaded areas... alert the Shift Commander and refer for Mental Health Evaluation." (Emphasis added). Moreover, notwithstanding her documentation of Farver's past suicide attempts, psychiatric hospitalizations and psychotropic medications, Nurse Dean did not refer Farver for a mental health evaluation, in direct contravention of CMS' guidelines.

That Nurse Dean decided to ignore the collective wisdom of the drafters of the intake form and CMS guidelines could lead a trier of fact to reasonably find that she was deliberately indifferent in the instant case. Indeed, both plaintiff's experts and Nurse Dean's colleagues have testified that failing to notify the shift commander after circling "yes" in response to Question No. 8 constitutes a breach of the standard of care. Moreover, Nurse Schreiner's testimony that Nurse Dean curtailed her own training on how to use the intake form and "didn't like being told what to do," further supports a finding that Nurse Dean deviated from the standard of care. Exactly how far Nurse Dean deviated from the standard of care, however, and whether it

14

constitutes "such a substantial departure" from accepted medical judgment as to rise to the level of deliberate indifference, is a question for the trier of fact.[11]

Notwithstanding additional depositions and exhibits submitted in support of Nurse Dean's renewed motion for summary judgment, the court concludes that the explicit language on the intake form, taken together with Farver's history of mental health problems, could lead a reasonable jury to find that Nurse Dean acted with deliberate indifference. As the court noted in Woodward I, 2001 WL 506863, at *5:

> The fact of the matter is that Nurse Dean failed to notify the shift commander as directed by the form she filled out during her examination of Farver, she failed to summarize or recommend a disposition on that form, and she failed to have that form reviewed by her supervisor. Consequently, Farver was not placed on suicide watch, he was not given an immediate mental health screening, and he was not placed on an immediate treatment program. The court agrees with plaintiff that even though, in retrospect, Nurse Dean's failures may appear to be diluted by the intervening days or events prior to Farver's suicide, a reasonable jury could still find that Nurse Dean acted with deliberate indifference to the known or obvious substantial risk that Farver would take his own life.

Accordingly, Nurse Dean's motion for summary judgment with respect to Count III is denied.

---

[11]That specific procedures existed at the jail for completing the intake form, processing inmates who responded affirmatively to Question No. 8, and further evaluating inmates who had a history of psychiatric hospitalizations and medications, distinguishes this case from Sanville v. McCaughtry, 266 F.3d 724 (7th Cir. 2001). Thus, Dr. Greifinger's testimony that Nurse Dean could have concluded that Farver was not acutely suicidal does not preclude a finding of deliberate indifference in the instant case. Indeed, Dr. Greifinger concluded in his expert report that Nurse Dean's failures to, (1) properly complete the intake form, (2) notify the shift commander, and (3) refer for mental health evaluation, constituted deliberate indifference, notwithstanding Nurse Dean's conclusion that Farver was not acutely suicidal.

**Count V – Plaintiff's §1983 claim against Mollner**

Applying the standards enumerated above to Mollner, the court concludes that a reasonable jury could find that Mollner acted with deliberate indifference to the obvious and substantial risk that Farver was going to take his own life. As described earlier, Mollner's evaluation noted that Farver felt "anxious, depressed, and not himself," as well as "depressed, angry." In response to the question, "History of suicidal ideation or behavior?" Mollner circled "Yes," and added the following:

> Over 10 self-destructive episodes. Most recent, 1995. Feels current suicidal proclivities as he knows what he did was wrong [and he is] not looking to spend rest of his life in prison. Over 10 psychiatric hospitalizations, most recent 4/95, for suicide attempt. Single, no children. Employed in child care [and] has cerebral palsy. Felt anxious.

Notwithstanding these observations, Mollner now maintains that he was not aware that Farver was suicidal. According to Mollner's deposition testimony:

> There was nothing specific. There was no specific ideation. He never talked about what he might do or what he could do. There was never any mention of a plan. Nor was there any indication or mention that he would ever enact on anything. So the amount of suicidal ideation - it was just a general, very mild kind of thing. So there was no indication to think that it was all that serious.

Assuming that a jury believed Mollner's testimony that he was not subjectively aware of Farver's desire to take his own life, the court concludes a jury could still find that Mollner overlooked an obvious risk that Farver was suicidal. Mollner knew that Farver had more than ten self-destructive episodes, that he felt current suicidal proclivities, that he knew what he did was wrong, and that he was not looking to spending the rest of his life in prison.[12]

---

[12]Whether Farver was "acutely suicidal," as the term is used clinically, is fiercely disputed by the parties. Mollner testified in his deposition that he did not interpret Farver's suicidal

(continued...)

Mollner also suggests that he did not fail to take reasonable steps to protect Farver, because he reasonably believed that Farver's placement in the medical pod meant that he was already on suicide watch.[13] The evidence, however, could lead a reasonable jury to conclude that Mollner was indeed deliberately indifferent in not taking further action to respond to Farver's suicidal proclivities.

Mollner concedes that not every patient in the medical pod was on suicide watch. Nonetheless, at his deposition, he testified that he assumed Farver must have been in the medical pod because of a suicide watch, since Farver's cerebral palsy was "so mild" that it would not have necessitated placement in the medical pod.

Drawing all reasonable inferences in plaintiff's favor, however, the court concludes that a reasonable jury could find that Mollner's failure to place Farver on suicide watch constitutes deliberate indifference.[14] Although Mollner may have indeed perceived Farver's cerebral palsy

---

[12](...continued)
suicidal proclivities as evidence that Farver was acutely suicidal. Plaintiff's expert, Dr. Greifinger, disagreed with Mollner's conclusions in this regard. It is possible, however, that this debate is merely academic. Indeed, Mollner himself testified that even mild suicidal ideation is sufficient to put an inmate on suicide watch: "There has to be some specifics. You can't just be a mild, you know, I don't feel like I should live anymore. I mean, that would put someone on a watch but that's not acute."

[13]The court notes the inconsistency between Mollner's insistence that he was not aware of the risk of Farver's suicide and his testimony that he believed Farver was on suicide watch.

[14]Plaintiff also points to Mollner's delay in referring Farver to Dr. Fernando for an evaluation as further evidence of deliberate indifference. According to Mollner, when he first proposed sending Farver to Dr. Fernando, Farver declined because he did not like the side effects of psychotropic medications. Mollner testified that, several days later, Farver sent him a note requesting to see Dr. Fernando, at which point he was referred for a psychiatric evaluation on October 11, 1998. Neither the conversation in which Farver allegedly declined to see Dr. Fernando, nor the subsequent note requesting to see Dr. Fernando, are documented in any of the
(continued...)

to have been mild, it made a sufficient impression upon Mollner to note it under the section of his evaluation titled, "Clinical Impression." A jury could reasonably infer, therefore, that Mollner knew that Farver was in the medical pod not because of a suicide watch, but rather because of his cerebral palsy. Although this inference may seem somewhat attenuated, when considered in light of Nurse Clark's testimony that Mollner routinely scolded nurses for placing patients on suicide watch, it may lead a trier of fact to conclude that Mollner was averse to putting suicide precautions in place for Farver - and that he was deliberately indifferent to a substantial risk that Farver would take his own life.[15]

That Farver was placed in between the cells of two other inmates who were on suicide watch does not alter the court's conclusion. Those inmates were allowed access to the medical pod dayroom, while Farver was in "lockdown," restricted to his cell, where on the day of his suicide he lay beneath his blanket fashioning the noose with which he hanged himself from the laundry hooks on his cell wall. As the court noted in Woodward I, 2001 WL 506863, at *8, had the jail staff been warned of Farver's suicidal condition,

> Farver would not have been allowed to lie in bed all day unchecked, he would not
> have been granted access to the telephone, he would not have been placed on
> lockdown, Myers [sic] would not have answered Farver's question the way he did,
> or Farver would have been moved to a padded room or a room without hooks on

---

[14](...continued)
documents produced in discovery, however. Because the court concludes that Mollner's failure to place Farver on suicide watch is sufficient in and of itself to create a question for the jury, the court declines to assess the merits of this argument in the absence of more competent evidence.

[15]The court also notes that, if Farver had been on suicide watch, he would have been seen by Mollner within three days of his placement in the medical pod. Even a cursory review of the date of Farver's intake form, therefore, would have revealed to Mollner that Farver was not in fact on suicide watch.

the wall—and that any one of these differences in the events that occurred during Farver's incarceration would have saved his life.

The court thus rejects Mollner's argument that "being on a 'formal' suicide watch would have changed nothing in connection with Justin's circumstance."

The court concludes, therefore, that material issues of fact exist with respect to Mollner's conduct that could lead a jury to conclude that he was deliberately indifferent to a substantial and obvious risk that Farver would take his life. Accordingly, Mollner's motion for summary judgment with respect to Count V is denied.

**Count VII – Plaintiff's § 1983 claim against Dr. Fernando**

Like Mollner, Dr. Fernando argues, albeit inconsistently, that, (1) he did not know that Farver was suicidal, and (2) he assumed Farver was on suicide watch, and that, as a result, he was not deliberately indifferent. Although the evidence produced against Dr. Fernando is perhaps less voluminous than that presented against Mollner and Nurse Dean, the court concludes that Dr. Fernando is not entitled to summary judgment on plaintiff's § 1983 claim.

First, the court concludes that, at the very least, a jury could reasonably conclude that the risk that Farver would commit suicide was obvious. Farver was referred to Dr. Fernando for "recent suicidal thinking." In his write-up of his evaluation, Dr. Fernando noted that Farver felt "hopeless, helpless, worthless," and later testified in his deposition that Farver "was manifesting current suicidal thinking or ideations, but no intent, no plan, and no means." Moreover, in response to the question, "[W]as there anything about your evaluation of [Farver] when you saw him that suggested he did not need to be on a suicide watch?" Dr. Fernando testified "No." These facts alone lead the court to conclude that a reasonable trier of fact could find that the risk

that Farver would take his own life was obvious, and that Dr. Fernando was subjectively aware of that risk.

With respect to whether Dr. Fernando was deliberately indifferent to this risk, and therefore did not take reasonable steps to prevent Farver's suicide, the court again directs the parties' attention to the ease with which Dr. Fernando and Mollner could have confirmed that Farver was or was not on suicide watch. Indeed, nothing in Farver's file indicated that suicide precautions had been taken, and the seventeen-day lapse between his placement in the medical pod and his evaluation by Dr. Fernando should have belied any inference that he was on suicide watch.[16] Accordingly, the court finds that Dr. Fernando is not entitled to summary judgment on Count VII.

## Counts IV and VI – Illinois Wrongful Death Claims Against Mollner and Fernando

As noted earlier, deliberate indifference involves more than mere negligence, but less than the purposeful or knowing infliction of harm. Farmer v. Brennan, 511 U.S. 825, 836 (1994). Accordingly, having established that plaintiff has produced sufficient evidence from which a jury could conclude that Mollner and Dr. Fernando acted with deliberate indifference to a substantial or obvious risk that Farver would take his life, the court finds that a reasonable jury could also conclude that Mollner and Dr. Fernando were negligent in their treatment of Farver.

Before turning to the next claim, the court pauses to address an evidentiary dispute regarding the experts in this case. Mollner and Dr. Fernando make much of the fact that Dr. Greifinger is a licensed pediatrician, arguing that, under both Illinois substantive law and Fed. R.

---

[16]Neither the court nor plaintiff takes issue with Dr. Fernando's prescription of Ativan and Zoloft for Farver.

Evid. 702, he is not qualified to render an opinion on the standard of care applicable to social workers and psychiatrists.[17]  While plaintiff apparently concedes that expert testimony is required to establish the standard of care applicable to Mollner and Dr. Fernando with respect to her Illinois Wrongful Death Claims, she disputes defendants' contention that Dr. Greifinger is not qualified to provide that testimony.  For the reasons discussed below, the court concludes that Dr. Greifinger is qualified to render expert testimony in the instant dispute.

In a diversity case, the admissibility of an expert's testimony is a question of procedure that is governed by federal law, specifically Fed. R. Evid. 702.  See Stutzman v. CRST, Inc., 997

---

[17]Defendants also dispute plaintiff's retention of Dr. Syed Ali as an expert witness, arguing that plaintiff did not comply with Fed. R. Civ. P. 26(a)(2)(A)-(C).  Rule 26(a)(2)(A) provides that parties must disclose the identity of expert witnesses, and Rule 26(a)(2)(B) provides that such disclosures must be accompanied by a report that includes "a complete statement of all opinions to be expressed and the basis therefor."  These disclosures are to be made at the times directed by the court, or in the absence of such a directive, at least 90 days before trial.  Fed. R. Civ. P. 26(a)(2)(C).

A party that, without "substantial justification," fails to disclose information required by Rule 26(a), is not permitted to use that expert or his testimony at trial or on motion, unless his failure to disclose was harmless.  Fed. R. Civ. P. 37(c)(1).  The determination as to whether such failure was indeed harmless is left to the broad discretion of the trial court.  Brand Name Prescription Drugs Antitrust Litig., 2001 WL 30454, at *1 (N.D.Ill. Jan. 11, 2001) (citing Finley v. Marathon Oil Co., 75 F.3d 1225, 1231 (7th Cir. 1990)).  To this end, the court should consider the surprise or prejudice to the blameless party, the ability of offender to cure any resulting prejudice, the amount of disruption to trial that would result from permitting the use of the evidence, and the bad faith involved in not producing the evidence at an earlier date.  Spearman Industries, Inc. v. St. Paul Fire & Marine Ins. Co., 138 F. Supp. 2d 1088, 1094 (N.D.Ill. 2001) (citing Bronk v. Ineichen, 54 F.3d 425, 432 (7th Cir. 1995)).

Although plaintiff did not identify Dr. Ali as an expert pursuant to Fed. R. Civ. P. 26 (a)(2)(A), defendants cannot colorably claim that they are surprised by his existence or the content of his opinions, since Dr. Ali was initially identified by defendants as one of their own experts.  It was only after Dr. Ali's deposition testimony proved favorable to plaintiff that plaintiff decided to name him as her expert.  Accordingly, defendants were not hampered in their ability to prepare for trial by plaintiff's failure to disclose Dr. Ali.  There is also no evidence that plaintiff acted in bad faith by failing to disclose Dr. Ali, or that the pending trial will be disrupted by permitting plaintiff to introduce Dr. Ali's testimony.  Thus, the court concludes that Dr. Ali may testify as an expert at trial.

F.2d 291, 295 (7th Cir. 1993) (holding that the Federal Rules of Evidence governing expert testimony are procedural and thus applicable in federal diversity cases); Allstate Ins. Co. v. Sunbeam Corp., 865 F. Supp. 1267, 1275 (N.D.Ill. 1994) ("If the state law rule is a rule of admissibility of expert evidence, it does not apply in federal court.").

Rule 702 provides that, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise...." (Emphasis added). Before admitting expert testimony, the district court judge should assure himself that "the expert knows whereof he speaks." Bammerlin v. Navistar International Transportation Corp., 30 F.3d 898, 901 (7th Cir. 1994). To this end, the district court judge acts as a "gatekeeper whose role is to keep experts within their proper scope." Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) (internal quotations omitted). This gatekeeping function applies to all expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1174.

Although academic expertise may certainly be sufficient to qualify a potential witness as an expert, the plain text of Rule 702 also includes experience, knowledge, skill and training as means of qualification. Accordingly, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." Smith, 215 F.3d at 718. Rule 702 does not require an expert to possess particular credentials. Erickson v. Baxter Healthcare, Inc., 151 F. Supp. 2d 952, 964 (N.D.Ill. 2001).

The gravamen of plaintiff's complaint in the instant dispute is that Mollner and Dr. Fernando failed to put Farver, a pretrial detainee, on a suicide watch after documenting that he had suicidal thoughts and proclivities. Dr. Greifinger served as the Chief Medical Officer for the New York State Department of Corrections from 1989 through 1995, and is a Fellow of the Society of Correctional Physicians. In addition to providing expert testimony in numerous federal and state courts regarding mental health care and suicide prevention policies at correctional facilities, Dr. Greifinger serves as a Principal Investigator for the National Commission on Correctional Health Care. The matters about which he will presumably testify in the instant case are clearly within his full range of practical experience, even if he has not practiced as a social worker or psychiatrist per se.[18]

---

[18]The parties appear to assume that Illinois law, rather than Rule 702, governs the court's assessment of Dr. Greifinger's competence to testify as an expert witness. Fed. R. Evid. 601 provides, "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law." See also Lovejoy Electronics, Inc. v. O'Berto, 873 F.2d 1001, 1005 (7th Cir. 1989) (citing Fed. R. Evid. 602 as an exception to the general rule that "federal rather than state law governs admissibility of evidence in federal diversity cases"); Legg v. Chopra, 286 F.3d 286, 291 (6th Cir. 2002) (distinguishing competence to testify, which is a substantive issue governed by state law in diversity cases, from admissibility of testimony, which is procedural and thus governed by Fed. R. Evid. 702).

Assuming arguendo, without deciding, that an evaluation of an expert's competence to testify is indeed distinct from the court's Rule 702 admissibility analysis, the court would still permit Dr. Greifinger to testify as an expert. Under Illinois law, a physician expert generally should be a licensed member of the school of medicine about which he will testify. Dolan v. Galluzzo, 77 Ill.2d 279, 285 (1979); Purtill v. Hess, 111 Ill.2d 229, 243 (1986). This rule is animated by a concern that the expert's allegations of negligence are within the expert's knowledge and observation. Wingo by Wingo v. Rockford Memorial Hospital, 292 Ill. App. 3d 896, 907 (2d Dist. 1997). Thus, when the allegations of negligence are well within the expert's knowledge and experience, and do not concern an issue upon which doctors from different schools of medicine would apply different standards, the rule need not be strictly applied. Id.

With these standards in mind, the court finds that Dr. Greifinger is competent to serve as an expert in the instant dispute. Notwithstanding the fact that he lacks a license to practice either

(continued...)

## Count II[19] – Plaintiff's § 1983 claim against CMS

The gist of plaintiff's § 1983 claim against CMS is that, notwithstanding CMS' published procedures and policies, the practices engaged in by CMS staff were wholly inappropriate and violated Farver's Fourteenth Amendment Due Process Rights. To this end, plaintiff has produced evidence that the staff routinely violated stated CMS' policies with respect to intake, training and suicide precautions, and that these violations were essentially condoned by CMS officials with policymaking authority who failed to take steps to ensure that CMS' policies, as written, were actually enforced.

Municipality liability under § 1983 arises when the execution of a government's policy or custom inflicts injury.[20] Estate of Novack, 226 F.3d at 531, (quoting Monell v. Department of Soc. Svcs., 436 U.S. 658, 694 (1978)). As the court noted in Woodward I, there are two ways for a plaintiff to establish that a constitutional injury was caused by a municipality's policy or custom. First, there is the direct method, which requires the plaintiff to show that the municipality's policy or practice is itself unconstitutional. Estate of Novack, 226 F.3d at 531 (citing Monell v. Department of Soc. Svcs., 436 U.S. 658, 694 (1978)). Second, there is the indirect method, which requires showing "'a series of bad acts and inviting the court to infer

---

[18](...continued)
social work or psychiatry, Dr. Greifinger's extensive experience with mental health programs within correctional facilities qualifies him to testify regarding the appropriateness of instituting suicide precautions for Farver.

[19]In Case No. 99 C 0290, plaintiff's § 1983 claim against CMS was designated as Count IV.

[20] CMS and plaintiff agree that CMS' potential liability under Count II is equivalent to that of a municipality under §1983 caselaw.

24

from them that the policymaking level of [the entity] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate [employees].'" Estate of Novack, 226 F.3d at 531 (quoting Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir. 1995)).

Plaintiff does not challenge the appropriateness or constitutionality of CMS' policies and procedures manual itself, conceding that the policies, as written, are consistent with due care. Rather, the crux of plaintiff's § 1983 claim is CMS' "consistent and unremitting disregard of its own [stated] policies." According to plaintiff, the "prevailing practice on the medical pod of the jail was chronically substandard and... CMS supervisors were aware of [this]."[21]

Monell teaches that, "it is when execution of [an entity's] . . . custom . . . inflicts the injury that the [entity] . . . is responsible under §1983." 436 U.S. at 694. The question becomes, then, whether a reasonable jury could find that it was CMS' custom of repeatedly failing to act to ensure Farver's safety that led to his successful attempt to commit suicide.[22] The facts in the instant case answer that question affirmatively. Plaintiff has produced testimony from both Nurse Clark and Nurse Schreiner that suggests that CMS officials with decisionmaking authority routinely tolerated, and essentially condoned, their subordinates' repeated violations of CMS' stated policies and procedures. For example, according to Nurse Clark, Mollner's refusal to

---

[21]To the extent that plaintiff's claims are based upon the misconduct of individual employees, the court notes that § 1983 liability against a municipality may not be founded on theories of vicarious liability or respondeat superior. Estate of Novack, 226 F.3d at 530 (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

[22] As the court noted in Woodward I, 2001 WL 506863, at *7, "It is well established... that single instances of such conduct (one example of a poorly trained employee and one example of a failure to supervise) do not establish a Monell claim." (Citations omitted.)

adhere to CMS' stated policy regarding the implementation of suicide precautions for patients like Farver was known by numerous nurses and at least one supervising nurse, Nurse Fryksdale. Further, Nurse Fryksdale testified that "on occasion" a nurse will circle "yes" in response to Question No. 8, yet not inform the shift commander, which is in direct contravention of the directive on the intake form, and arguably prevents suicidal patients from receiving appropriate and timely intervention.[23]

Given CMS' alleged rampant disregard for its own stated policies and procedures, the court concludes that a reasonable jury could find that CMS' custom of failing to intervene and provide appropriate services for potentially suicidal inmates caused Farver's death. Accordingly, CMS' motion for summary judgment on Count II is denied.

## CONCLUSION

For the reasons stated herein, defendants' motions for summary judgment are denied.

**ENTER:**      **December 4, 2002**

**Robert W. Gettleman**
**United States District Judge**

---

[23] Nurse Clark and Nurse Schreiner further testified that the nurses were, at some points, up to one month behind on conducting intakes, notwithstanding policy 31.01, which outlines procedures "to ensure that inmates being admitted into custody are evaluated in a timely manner for potential psychiatric problems, psychological difficulties and/or risk for suicidal behavior." According to Nurse Schreiner, this backlog could cause inmates and/or detainees to "fall through the cracks."

26